[Cite as *Prosch v. Jackson*, 2026-Ohio-2585.]

IN THE OHIO COURT OF APPEALS
FIFTH APPELLATE DISTRICT
TUSCARAWAS COUNTY, OHIO

| | |
|---|---|
| BRENDON PROSCH, NEXT BEST FRIEND OF A.P. | Case No. 2025 AP 11 0038 |
| Petitioner - Appellee | Opinion and Judgment Entry |
| -vs- | Appeal from the Tuscarawas County Court of Common Pleas, Case No. 2025 VI 08 0307 |
| TERRANCE JACKSON | Judgment: Affirmed |
| Respondent - Appellant | Date of Judgment Entry: July 2, 2026 |

**BEFORE:** William B. Hoffman; Craig R. Baldwin; David M. Gormley, Judges

**APPEARANCES:** Gregory McCleery, for Petitioner-Appellee; Dan Guinn, Guinn Law Firm, LLC, for Respondent-Appellant.

*Hoffman, P.J.*

{¶1} Respondent-appellant Terrance Jackson appeals the October 31, 2025 Domestic Violence Civil Protection Order issued by the Tuscarawas County Court of Common Pleas, which named A.P., J.P., and W.P., the children of petitioner-appellee Brendan Prosch, Next Best Friend of A.P., as the protected parties.

STATEMENT OF THE FACTS AND CASE

{¶2} Appellee and Alexa Prosch ("Mother") are the parents of A.P., J.P., and W.P. ("the Children," collectively). Appellee and Mother's marriage was terminated by decree of dissolution in August, 2021. Pursuant to their Shared Parenting Plan, Mother was named

residential parent and Appellee was granted parenting time every other weekend. Appellant is Mother's paramour and her former brother-in-law. Mother and the Children moved in with Appellant in 2023.

{¶3} On August 20, 2025, Appellee filed a petition for domestic violence civil protection order ("DVCPO") against Appellant on behalf of the Children. The petition alleged Appellant had physically assaulted A.P., the oldest of the Children; verbally demeaned the Children; physically abused the family dog; and drove recklessly while the Children were in his vehicle. The trial court issued an ex parte DVCPO on the same day.

{¶4} The trial court conducted a full hearing over the course of two days, August 26, and October 23, 2025. The following testimony was presented at the hearing:

{¶5} On August 10, 2025, A.P. disclosed to Appellee two incidents of abuse perpetrated on her by Appellant; the first on August 1, 2025, and the second on August 6, 2025. A.P. was delayed in telling Appellee because Appellant had taken away her iPad as punishment and the iPad was A.P.'s method of communicating with Appellee. At the time of A.P.'s disclosure, the Children were at Lake Erie with their grandmother. It was at that time A.P. was able to use her grandmother's phone to contact Appellee. Appellee instructed the Children's grandmother to bring the Children to his residence rather than return them to Mother. Appellee subsequently contacted Children's Protective Services and the police.

{¶6} A.P. learned three or four years earlier Mother and Appellant were engaged in a relationship. As a result, A.P. did not want anything to do with Appellant, which resulted in her having difficulties interacting with him. In late August/early September, 2023, Mother and the Children moved into Appellant's apartment. After moving into his apartment, Appellant began to punish the Children more. A.P.'s dislike of Appellant grew stronger.

{¶7} On August 1, 2025, Appellant instructed A.P. and W.P. to come downstairs and wash the dishes. While Appellant was showing something to them, A.P. quickly looked up and back down, giving what she described as a blank expression, her "normal face." Transcript of Civil Protection Order Hearing, Vol. I, p. 27. Appellant demanded A.P. stop giving him an attitude and informed her he would take her iPad away for the weekend. When Appellant began taunting A.P., A.P. left the room, walked upstairs and into the bathroom. She locked the door behind her because she was scared. Appellant followed A.P. upstairs, yelling at her to come out of the bathroom. Appellant was able to unlock the bathroom door. He pushed the door open, shoving A.P. against the wall and hurting her arm and side. Appellant entered the bathroom, grabbed A.P. by the arm, then pulled her out and halfway down the stairs. A.P. yelled at Appellant to let her go. Appellant told her she needed to be slapped. A.P. eventually went downstairs and finished the dishes.

{¶8} A.P. disclosed the incident to her aunt on August 5, 2025, and to her grandmother on August 6, 2025. After the August 1, 2025 incident, Appellant took A.P.'s iPad which cut off her ability to communicate with people. On August 6, 2025, A.P. attempted to talk to Mother, who became upset when she learned A.P. had talked with her aunt. A.P. felt Mother was not concerned about Appellant's treatment of her. A.P. went downstairs and locked herself in the bathroom.

{¶9} Appellant returned home and immediately ordered A.P. out of the bathroom. A.P. complied and tried to go upstairs to her bedroom. Appellant insisted she demonstrate to Mother what Appellant had done to her on August 1, 2025. A.P. refused and Appellant attempted to grab her arm. A.P. yelled at Appellant not to touch her, and ran outside, continuing to yell, "Don't touch me." Mother told A.P. to come back inside. When A.P.

went into the kitchen, Appellant grabbed her and pulled her up the stairs. Mother yelled at Appellant to stop because she did not want the Children taken away from her. Mother did not call for help.

{¶10} A.P. broke away from Appellant and ran into the living room. Appellant grabbed her and was "getting in [her] face." *Id*. at p. 32. Mother continued to yell at Appellant to stop. At some point during the commotion, Appellant slapped A.P.'s leg, leaving bruises. A.P. started to hyperventilate. As she walked by Appellant to speak with Mother, Appellant made her hug him. J.P. and W.P. were present and observed the incident.

{¶11} A.P. recalled Appellant threatened to hit her with a belt three times during the August 6, 2025 incident and had previously threatened the same. A.P. reiterated she was unable to contact anyone for help because Appellant and Mother took her iPad and would not allow her to use it. A.P. stated Appellant disciplined her "way more" than Mother. Tr., Vol. II, p. 6. Appellant disciplined A.P. for not saying goodnight to him, when he believed she was looking at him funny or not looking at him, and when she would not sit by him at one of her sibling's soccer games. According to A.P., Appellant did not respect her privacy or the privacy of her siblings. She described Appellant walking into the bathroom and using the toilet while she was taking a shower. Appellant would also walk into her bedroom without warning. A.P. was afraid to tell him to stop for fear of getting in trouble. A.P. also observed Appellant physically abuse Mother. A.P. indicated she does not feel safe in Mother and Appellant's home.

{¶12} Mother testified on Appellant's behalf. Mother and Appellant had been in a relationship for approximately 4 ½ years. She denied they were having an affair while she was married to Appellee. Mother and the Children have lived with Appellant for the past 2

or 3 years.  Although Appellee did not want the Children to live with Appellant, he threatened, but did not take, any legal action.  According to Mother, Appellant has never abused her or the Children and the Children have never accused Appellant of abusing them.  Mother permitted Appellant to spank the Children, if such was necessary, but she never observed him do so.  Mother never feared for the Children's safety when they were with Appellant.  She never heard Appellant threaten the Children and claimed he was always appropriate with them.

{¶13}  Mother stated A.P. does not like Appellant and has always had an attitude with him.  Mother has told A.P. multiple times she needed to be respectful to Appellant.  Mother testified A.P. has "never gotten in trouble other than just had her iPad taken away after I've talked to her about having an attitude she won't like come in and say hello ever."  *Id*. at p. 45.  Mother denied the Children told her they were fearful of Appellant.

{¶14}  Mother described the August 1, and August 6, 2025 incidents involving Appellant and A.P. as explained to her by Appellant.  Mother's rendition of Appellant's narrative differed greatly from A.P.'s version of the events.

{¶15}  On cross-examination, Mother claimed A.P. was lying about some of the allegations she made. Mother described A.P. as "very over-reactive of everything" and "just very over-the-top with things."  *Id*. at p. 63. Mother acknowledged she observed Appellant strike A.P., which resulted in a mark on A.P.'s leg, but indicated she would never let Appellant hit A.P.

{¶16}  Appellant testified on his own behalf.  He agreed with Mother's testimony they did not have an affair while either was married.  Appellant denied threatening or hitting the Children or Mother.  Appellant stated A.P. has always been rude to him and she has had a

"constant attitude." *Id*. at p. 71. Appellant described the August 1, 2025 incident as him merely grabbing A.P. by the arm when she refused to do the dishes. The August 6, 2025 incident occurred when A.P. was disrespecting Mother. Appellant told A.P. to stop three times, warning he would spank her if she did not. Appellant spanked A.P. on the leg then spanked her a second time. Appellant stated he did not "smack" A.P. out of anger, adding he followed "it up with love" and an explanation of why her behavior was "not okay." *Id*. at p. 77.

{¶17} On cross-examination, Appellant acknowledged the August 6, 2025 incident in which he struck A.P. on the leg, leaving a mark, but referred to it as a spanking. Appellant stated it was the first time he had ever spanked A.P. When asked "your testimony to this court is that when you have again, [a] thirteen-year-old girl who's hysterical about being touched that your calm and deliberate decision was to corporally punish her," Appellant responded, "Yes." *Id*. at p. 84. Appellant agreed Mother told him to stop during the August 6, 2025 incident, but contended she did so because she knew A.P. would tell Appellee and Appellee was constantly threatening to take the Children. Appellant conceded, although Mother told him to stop, he struck A.P. a second time.

{¶18} On October 31, 2025, the trial court issued the DVCPO, naming the Children as the persons protected by the order. The trial court included Additional Findings with the DVCPO. The trial court found Appellant "caused physical harm in the form of bruising on [A.P.] in what [he] characterized as spanking." Additional Findings, p. 1, unpaginated. The trial court added, "[t]he markings [on the interior of A.P.'s leg] appear to be bruising from [A.P.] having been grabbed by [Appellant] which [Appellant] does not deny." *Id*. The court further found Appellant's conduct did not amount to reasonable corporal punishment and his

actions were not reasonable parental discipline. The trial court concluded Appellant engaged in domestic violence toward A.P.

{¶19} It is from the trial court's issuance of the DVCPO Appellant appeals, raising the following assignments of error:


I. THE COURT ERRED IN ISSUING A CIVIL PROTECTION ORDER AGAINST THE APPELLANT.

II. THE COURT ERRED IN INCLUDING [J.P.] AND [W.P.] IN THE CIVIL PROTECTION ORDER.


## I, II

### *Standard of Review*

{¶20} The decision whether to grant a civil protection order lies within the sound discretion of the trial court. *Singhaus v. Zumbar*, 2015-Ohio-4755, ¶12 (5th Dist.). In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983). Further, when the challenge to the DVCPO involves the scope of the order—including the decision to add minor children as protected parties—we, likewise, review the order for an abuse of discretion. *Martindale v. Martindale*, 2017-Ohio-9266, ¶ 51 (4th Dist.), citing *Reynolds v. White*, 1999 WL 754496 (8th Dist.) ("R.C. 3113.31 expressly authorizes trial courts to 'craft protection orders that are tailored to the particular circumstances,' and therefore, challenges to the scope of a protection order are reviewed for an abuse of discretion.").

{¶21} A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. *Swartz v. Van Deest*, 2023-Ohio-1882, ¶ 18 (5th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179. The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. Jamison*, 49 Ohio St.3d 182 (1990). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997).

*Analysis*

{¶22} A petition for a domestic violence civil protection order is governed by R.C. 3113.31, which states, in relevant part:

> (A) As used in this section:
>
> (1) "Domestic violence" means any of the following:
>
> (a) The occurrence of one or more of the following acts against a family or household member:
>
> (i) Attempting to cause or recklessly causing bodily injury;
>
> (ii) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code;
>
> (iii) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code;
>
> (iv) Committing a sexually oriented offense.

{¶23} "When granting a protection order, the trial court must find that petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence. R.C. 3113.31(D)." *Felton v. Felton*, 79 Ohio St. 3d 34, paragraph two of the syllabus (1997). "Preponderance of the evidence" is "the greater weight of the evidence, or evidence that leads the trier of fact to find that the existence of a contested fact is more probable than its nonexistence." *State v. Stumpf*, 32 Ohio St.3d 95, 102 (1987).

{¶24} Appellant contends, "[t]he only thing [he] did was to smack [A.P.] * * * once on the leg in response to her continuous disrespect to the Mother." Brief of Appellant at p. 20. Appellant adds, although A.P. claimed Appellant previously threatened her and there were other incidents in the past, she never disclosed such to anyone, including Appellee, despite having the opportunity to do so. Appellant also suggests because A.P.'s version of the events "greatly differed" from his and Mother's version, A.P. should not be believed. We disagree.

{¶25} Upon review of the record, we find the trial court did not abuse its discretion in finding Appellee established by a preponderance of the evidence A.P. was in danger of domestic violence. A.P. explicitly detailed the events of August 1, and August 6, 2025. She recalled after Appellant demanded A.P. stop giving him an attitude and started taunting her, she left the room, and walked upstairs and into the bathroom. Appellant unlocked the bathroom door, pushed the door open, shoving A.P. against the wall and hurting her arm and side. Appellant entered the bathroom, grabbed A.P. by the arm, then pulled her out and halfway down the stairs. A.P. yelled at Appellant to let her go. Appellant told her she needed to be slapped.

{¶26}  Regarding the incident on August 6, 2025, A.P. explained she tried to discuss the August 1st incident with Mother.  A.P. became upset and locked herself in the bathroom. Appellant ordered her out of the bathroom and she complied.  Appellant insisted A.P. demonstrate to Mother what Appellant had done to her on August 1, 2025.  A.P. refused and Appellant attempted to grab her arm.  A.P. yelled at Appellant not to touch her, and ran outside, continuing to yell, "Don't touch me." Mother told A.P. to come back inside.  When A.P. went into the kitchen, Appellant grabbed her and pulled her up the stairs.  A.P. broke away from Appellant and ran into the living room.  Appellant grabbed her.  Appellant slapped A.P.'s leg, leaving bruises. A.P. recalled Appellant threatened to hit her with a belt three times during this incident.

{¶27}  Appellant acknowledged he struck A.P., but explained he did not "smack" her out of anger and followed up with love and an explanation of why her behavior was not acceptable.  Although Appellant left a mark when he struck A.P. on the leg, he characterized it as a spanking.  When asked "your testimony to this court is that when you have again, [a] thirteen-year-old girl who's hysterical about being touched that your calm and deliberate decision was to corporally punish her," Appellant responded, "Yes."  Tr., Vol. II at p. 84. Appellant conceded, although Mother told him to stop, he struck A.P. a second time.

{¶28}  The trial court found Appellant's conduct did not amount to reasonable corporal punishment and his actions were not reasonable parental discipline. The weight to be given to the evidence and the credibility of the witnesses was solely in the purview of the trial court. The trial court was in the best position to view the demeanor, attitude, and credibility of the witnesses.  We will not and cannot substitute our judgment for that of the trial court as there was some competent and credible evidence to support its decision.

**{¶29}** We now turn to Appellant's second assignment of error in which he maintains the trial court erred in including J.P. and W.P. in the DVCPO. We note Appellee specifically requested A.P. as well as J.P. and W.P. be included as protected parties under the DVCPO.

**{¶30}** "[T]he intent of the domestic violence statute as contained in R.C. 3113.31 is to protect the victims of domestic violence *and that this protection extends to siblings*." (Emphasis added.) *Carpeno v. Carpeno*, 2005-Ohio-7046, ¶14 (11th Dist.). "When issuing a CPO * * * the court is prompted to consider not only the petitioner *but also the petitioner's family or household members*." (Emphasis added.) *Felton*, 79 Ohio St. 3d 34, paragraph two of the syllabus.

**{¶31}** The record establishes Appellant engaged in domestic violence toward A.P.; therefore, it follows the remaining children of the family, J.P. and W.P., would also properly fall within the ambit of the DVCPO. "The statutory criterion to determine whether or not to grant a civil protection order pursuant to R.C. 3113.31 is the existence or threatened existence of domestic violence." (Citations omitted.) *R.E.S. v. M.J.M.*, 2025-Ohio-546, ¶ 17 (8th Dist.). We find the trial court did not abuse its discretion in including J.P. and W.P. as there was a threatened existence based upon the existence of domestic violence relative to A.P.

{¶32}   Based upon the foregoing, Appellant's first and second assignments of error are overruled.

{¶33}   The judgment of the Tuscarawas County Court of Common Pleas is affirmed.

{¶34}   Costs to Appellant.


By: Hoffman, P.J.

Baldwin, J. and

Gormley, J. concur.